IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | *   Case No.: 23-cr-00401-PX |
| SEAN PAUL HURD | * |

\*   \*   \*   \*   \*

**<u>DEFENDANT'S REPLY
TO GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS</u>**

The Defendant, Sean Hurd, hereby submits this Reply to the Government's Opposition to Motion to Suppress, found within its Consolidated Opposition to Defendant's Motions (hereafter "the Response). ECF 46.

When officers boxed in the parked car where Mr. Hurd was a passenger, they approached, noted that there was marijuana in the vehicle, and engaged in a back-and-forth with the driver over whether it was legal for them to search the car. In the two-minute time period between the initial approach and the pat-down that is at issue in this case, Mr. Hurd can be seen on video listening attentively to the officers, retrieving his identification immediately when asked to, and exiting the vehicle immediately when asked to.

In its Response, the Government presents a counterfactual narrative of Mr. Hurd's behavior, claiming that: (1) Mr. Hurd "reach[ed] awkwardly with his right arm across his body" to "shield" his right side from view; (2) that he was "nervous" and "shaking"; and (3) that he "avoid[ed] eye contact." In reality, the video footage shows that Mr. Hurd: (1) had to reach across his body to retrieve his identification as instructed, and at various times afterward held his arm away from his right side; (2) showed no signs of nervousness that can be perceived by the video; and (3) is seen on the video consistently making eye contact with the officer as instructions are given.

1

In support of the pat-down, the Response relies primarily on *United States v. Sakyi*, 160 F.3d 164 (4th Cir. 1998), in which a pat-down of a passenger based on the presence of illegal drugs in a vehicle is permitted where the drugs are not "readily attributable" to the driver. As explained further below, the Government's argument that the lit marijuana cigarette held by the driver in this case was not "readily attributable" to her is without merit. Because the officers did not have particularized reasonable suspicion that Mr. Hurd was "armed and dangerous," and because this case is distinguishable from *Sakyi*, the fruits of the pat-down should be suppressed.

**I.    The reasons for the pat-down as cited by the Government are not consistent with the body-worn camera footage.**

Regardless of the reason for the stop, *Terry* and its progeny require an additional, different justification for a pat-down: it is not sufficient that the officers have reasonable suspicion to conduct a stop, they also must put forth reasons why they believe the person detained is "armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *United States v. Robinson*, 846 F.3d 694, 700 (4th Cir. 2017) ("In short, established Supreme Court law imposes two requirements for conducting a frisk, but no more than two: *first*, that the officer have conducted a lawful stop, which includes both a traditional *Terry* stop as well as a traffic stop; and *second*, that during the valid but forced encounter, the officer reasonably suspect that the person is *armed and therefore dangerous*.") (emphasis in original); *see also United States v. McKinney*, 980 F.3d 485, 496 (5th Cir. 2020) ("We have described the standard for justifying a pat-down as being 'more onerous' than that for the initial stop.").

In order to justify the pat-down in this case, the Government cites factors that are either not particularized to Mr. Hurd, or are contradicted by the body-worn camera footage.

### A. The camera footage does not support the Government's contention that Mr. Hurd was "shielding the right side of his body from view" with his right arm.

The Response repeatedly claims that Mr. Hurd used his right arm to "shield" his body, "presumably to avoid his jacket riding up and revealing the bulge from a firearm." Response at 3, 7. This claim is not consistent with the evidence.

The interaction between the officers and the occupants of the vehicle lasted approximately two minutes before the pat-down at issue was conducted. Gov. Ex. 2 at 0:32 – 2:42. During that period, Mr. Hurd's right arm can be seen at various times:

- ➢ reaching for his identification with his right hand in response to a command from Corporal Jones (Gov. Ex. 3 at 0:46);

- ➢ holding his license away from his body with his right hand (Gov. Ex. 3 at 1:30);

- ➢ using his right hand – again, away from his body – to unlock the car door (Def. Ex. 1, *Officer Hayes Body-Worn Camera*,[1] at 1:45);

- ➢ holding his arm naturally by his side waiting for the officers' command to exit the vehicle (Gov. Ex. 3 at 1:40); and

- ➢ holding his right arm away from his body as he exits the vehicle, still holding his identification (Gov. Ex. 3 at 1:42).

To the extent that Mr. Hurd moved his right arm "awkwardly," this can be readily explained by the fact that Corporal Jones asked Mr. Hurd to produce his identification, but no officer took it from him, leaving Mr. Hurd futilely holding the card out toward Corporal Jones for most of the two-minute encounter. The views of Mr. Hurd holding his right arm away from his body are not consistent with the Government's assertion that he was attempting to hide his right side from the officers' view.

---

[1] Officer Hayes' full body-worn camera as provided in discovery lasts approximately thirteen minutes. The first two minutes, comprising the officers' approach and pat-down of Mr. Hurd, are provided as Defense Exhibit 1.

**B. The camera footage does not support the Government's assertion that Mr. Hurd was nervous.**

The Government also claims that Mr. Hurd was "nervous," "shaking," "hesitant," and "avoiding eye contact" as justification for the pat-down. Response, 8. These assertions are similarly unsupported by the camera footage.

Nervousness has long been disfavored by courts as a reasonable suspicion factor, for the simple reason that it is common for people to be nervous when stopped by the police. *See Delaware v. Prouse*, 440 U.S. 648 (1979) (a traffic stop can be an "unsettling show of authority" which "may create substantial anxiety"); *United States v. Williams*, 808 F.3d 238, 248 (4th Cir. 2015) ("although nervousness has sometimes been utilized in finding reasonable suspicion, it is an unreliable indicator, especially in the context of a traffic stop") (citation omitted).

Accordingly, the Fourth Circuit has recognized that for nervousness to be relevant to the reasonable suspicion analysis, it must be "extreme," so as to be easily distinguished from the ordinary reaction of a person in a traffic stop:

> Granted, "nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police." [*United States v. Palmer*, 820 F.3d 640, 652–53 n.7 (4th Cir. 2016)]. But we have held that nervousness can still be a "relevant factor" to the reasonable suspicion inquiry where (1) the suspect's nervousness is extreme—'unusual, beyond the norm, or evasive'—and (2) the officer articulates specific facts supporting his conclusion that the suspect was extremely nervous. *See* [*United States v. Miller*, 54 F.4th 219, 229 (4th Cir. 2022)].

*United States v. Smart*, 91 F.4th 214, 226 (4th Cir. 2024), cert. denied, 144 S. Ct. 2671, (2024), reh'g denied, 145 S. Ct. 367 (2024).

In this case, Mr. Hurd's face and body are visible at various points throughout the two-minute encounter, and by all appearances he is calm and attentive. While it is certainly possible that the officers had a better opportunity to observe Mr. Hurd than is reflected in the camera

4

footage, there is a wide gulf between what the Government claims in its Response and what is reflected in the video: there is simply no evidence of Mr. Hurd exhibiting extreme nervousness. The Government's claim that Mr. Hurd "avoid[ed] eye contact" (Response, 8) is not supported in the footage, and is refuted by multiple angles of Mr. Hurd looking directly at Corporal Jones during the encounter.  Gov. Ex. 2 at 0:48; Def. Ex. 1 at 1:43.  Similarly, the Government's claim that Mr. Hurd was acting "hesitantly," is contradicted by Mr. Hurd's immediately retrieving his identification (Gov. Ex. 3 at 0:45), and immediately exiting the vehicle when told to do so (Gov. Ex. 3 at 1:42).[2]

In sum, while the video certainly does not capture every facet of the interaction, there is more than enough video of Mr. Hurd's behavior to rule out the sort of "extreme" nervousness that would contribute to a reasonable suspicion analysis. *See Miller*, 54 F.4th at 229 ("when an officer's testimony is clearly contradicted by video evidence, the court should normally discount the testimonial statements.").

## II. The lit marijuana cigarette was "readily attributable" to the driver under the plain language of *Sakyi*.

The holding of *United States v. Sakyi*, allowing officers to pat down all occupants in a vehicle where "illegal drugs" were present, applied where the drugs were not "readily attributable" to a particular occupant of the vehicle.  160 F.3d 164, 169 (4th Cir. 1998).  The Government does not take issue with this holding, but instead argues that the lit marijuana cigarette at issue in this case was not "readily attributable" to the driver, who was holding it in her hand when the officers approached.  Response, 6.  This argument is without merit.

---

[2] It is true that once out of the vehicle, Mr. Hurd is asked twice to put his hands on his head.  (Gov. Ex. 3 at 1:52-1:53).  The video shows that Mr. Hurd was already raising his arms, albeit slowly, when asked the second time (Def. Ex. 1 at 2:03).  In either case, this should not be considered in the reasonable suspicion analysis, as it occurred after the pat-down began, and the Government does not cite this as a factor supporting the search.

A "'person's mere propinquity' to suspected criminal activity 'does not, without more, give rise'" to individualized suspicion justifying a Fourth Amendment search. *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 277 (4th Cir. 2004) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)); *see also United States v. Blue*, 808 F.3d 226, 232 (4th Cir. 2015) ("dominion and control cannot be established by mere proximity to the contraband, by mere presence on the property where the contraband is found, or by mere association with the person who does control the contraband.") (citations omitted).

A common-sense reading of *Sakyi* leads to the conclusion that a personal-use cigarette, being held by one person, is "readily attributable" to that person. The driver's statement, "But I had it" (Gov. Ex. 2 at 1:53) does little to change this analysis.[3] The Government, however, spins a web of inferences from this statement, arguing that the driver was attempting to protect Mr. Hurd from being searched, and that therefore she may have been holding the cigarette on his behalf. Response, 6. Even assuming, *arguendo*, that the driver was attempting to protect Mr. Hurd from being asked out of the vehicle, the Government does not explain why this assertion of Mr. Hurd's rights leads to the inference that Mr. Hurd had been in possession of the marijuana. Such mental gymnastics do not "logically demonstrate" criminality or dangerousness on the part of Mr. Hurd. *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011).

### III. The Response mischaracterizes Mr. Hurd's position on *Sakyi*.

As Mr. Hurd argued in his Motion to Suppress, ECF 40, the holding of *Sakyi* depended heavily on the proposition that "guns often accompany drugs," and *Sakyi* cited cases which dealt with such crimes as trafficking in cocaine. Motion to Suppress, 8 (citing *Sakyi*, 160 F.3d at 169). Its holding specifically drew that inference from the presence of "illegal drugs." *Id*. It is therefore

---

[3] The driver later asks, "But why is he getting searched for?" but this statement occurs after the pat-down has already begun, and should not be considered as a reason for the pat-down. Gov. Ex. 2 at 2:39.

appropriate to question whether the marijuana legalization movement has taken marijuana out of that class of "illegal drugs" to which *Sakyi* referred. Beyond simply citing to *Sakyi*, the Government does not offer a rationale for why a single marijuana cigarette, being smoked in a parked car in an area where possession was at the time a civil offense, would be indicative of drug trafficking or gun possession.

Instead, the Government presents a straw man, stating that: "The Defendant argues that *Sakyi* and the general notion that drugs and guns are closely associated are outdated given recent shifts in how society views marijuana. *See* ECF 40 at 8-10. However, *Sakyi* remains controlling law in the Fourth Circuit and the Defendant cites no authority suggesting otherwise." Response at 8, n.9. This misstates Mr. Hurd's position in two important respects:

*First*, as noted above, it is not the "general notion that drugs and guns are closely associated" with which Mr. Hurd's Motion to Suppress takes issue, it is the outdated notion that *a personal use amount of marijuana* and guns are still closely associated, in an era when recreational marijuana is decriminalized and ubiquitous.[4]

*Second*, Mr. Hurd's Motion does not suggest that *Sakyi* has been overruled in the Fourth Circuit, but instead distinguishes the instant case from *Sakyi* in several respects, including the fact that the marijuana at issue here was "readily attributable" to the driver.

## CONCLUSION

The body-worn camera and the Government's Response portray two versions of Mr. Hurd which have little in common. The Mr. Hurd on video appears calm and responsive to commands, while the Mr. Hurd in the Response is "nervous" and "shaking"; "hesitant;" and "avoiding eye contact." One is holding his identification card out to his side, and the other is attempting to

---

[4] As an analogy, in the seminal 1925 case of *Carroll v. United States*, the Supreme Court upheld the warrantless search of a vehicle based on probable cause to believe that the Oldsmobile roadster contained illegal alcohol. 267 U.S. 132 (1925). Nearly a century after the end of Prohibition, *Carroll* remains good law, but officers are no longer allowed to rip apart car seats to find hidden bottles of whiskey and gin.

conceal his side. Fortunately, this Court need not determine Mr. Hurd's exact level of nervousness: it is enough to conclude, under *Smart*, 91 F.4th 214, and similar cases from this Circuit, that the camera footage does not support a finding of "extreme nervousness," and therefore this factor does not contribute to the reasonable suspicion analysis.

Absent significant particularized suspicion as to Mr. Hurd, the Government relies on *Sakyi* to justify the pat-down. *Sakyi* is distinguishable from this case for reasons stated in the Motion to Suppress, and the Government's argument that the lit marijuana cigarette in the driver's hand was not "readily attributable" to her should not be given weight. For these reasons and those previously stated, the evidence obtained as a result of the pat-down should be suppressed.

JAMES WYDA
Federal Public Defender
  for the District of Maryland

       /s/
SEAN MCKEE
JULIE L.B. STELZIG (#27746)
Assistant Federal Public Defenders
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
Telephone: (301) 344-0600
Fax: (301) 344-0019
Email: julie_stelzig@fd.org
Email:  sean_mckee@fd.org
